2000 ND 30

Curtis BOUDREAU, Plaintiff
and Appellant,

v.

The ESTATE OF Scott Alan MILLER,
Dominion of Canada General Insur-
ance Company; Co-operators General
Insurance Company, d/b/a the Co–Op-
erators; AXA Insurance (Canada);
Brian Erickson; Mercedes Surveys,
Inc., a Canadian corporation, Defen-
dants,

and

Stark County, North Dakota, a po-
litical subdivision, Defendant
and Appellee.

Trevor Boudreau, Plaintiff
and Appellant,

v.

The Estate of Scott Alan Miller, Domin-
ion of Canada General Insurance
Company; AXA Insurance (Canada);
Brian Erickson; Mercedes Surveys,
Inc., a Canadian corporation, Defen-
dants,

and

Stark County, North Dakota, a po-
litical subdivision, Defendant
and Appellee.

Nos. 990144, 990145.

Supreme Court of North Dakota.

Feb. 22, 2000.

Steven A. Storslee, Storslee Law Firm, P.C., Bismarck, for plaintiffs and appellants.

Randall J. Bakke, Smith Bakke Hovland & Oppegard, Bismarck, for defendant and appellee.

MARING, Justice.

[¶ 1] Curtis Boudreau and Trevor Boudreau appealed the district court's orders granting summary judgments dismissing Stark County from their actions, from orders for judgment, and from the judgments. We affirm.

[¶ 2] On June 23, 1995, Trevor Boudreau and Curtis Boudreau were passengers in a vehicle driven by Brian Erickson which collided with a vehicle driven by Scott Alan Miller at the intersection of two Stark County gravel roads. The Erickson vehicle was eastbound on one road and the Miller vehicle was northbound on the other road when the accident occurred. There were no signs on the east/west road at the intersection. There were no stop or yield signs on the north/south road at the intersection. There were crossroad signs on the north/south road at the intersection. There was no evidence either driver tried to stop before the collision. Miller was killed in the accident, and Boudreaus were injured.

[¶ 3] Boudreaus separately sued the Estate of Scott Alan Miller; Brian Erickson; Mercedes Surveys, Inc., Erickson's employer; Stark County; and three insurance companies. The claims against the insurers were severed from the case. Boudreaus alleged "Stark County was negligent in that it failed to sign or otherwise warn persons on the roadway of this intersection." The trial court granted summary judgment dismissing Stark County. The actions went to trial against Erickson, Mercedes, and Miller. The jury returned special verdicts attributing 70% of the fault to Erickson and 30% to Miller.

[¶ 4] A February 26, 1999, judgment awarded Curtis Boudreau $682,141.66 against Erickson and Mercedes, and awarded Stark County costs and disbursements against Curtis Boudreau.[1] Another February 26, 1999, judgment awarded Trevor Boudreau $147,700 from Erickson and Mercedes; $63,300 from the Estate of Scott Alan Miller; and costs and disbursements against all three defendants.

[¶ 5] Boudreaus have raised the following issue on appeal: "Whether the District Court erred by granting summary judgment in favor of Stark County on the basis that Stark County had no duty to sign or place warnings on the roads where this accident occurred."

I

[¶ 6] Summary judgment under N.D.R.Civ.P. 56, is a procedural device for prompt and expeditious disposition of a controversy without a trial if there is no genuine issue of material fact or if the law is such that resolution of factual disputes will not alter the result and a party is entitled to a judgment as a matter of law. *Miller v. Kloeckner*, 1999 ND 190, ¶ 5, 600 N.W.2d 881. Negligence actions are ordinarily inappropriate for summary judgment. *Gullickson v. Torkelson Bros., Inc.*, 1999 ND 155, ¶ 6, 598 N.W.2d 503; *Barsness v. General Diesel & Equip. Co.*, 383 N.W.2d 840, 844 (N.D.1986). In ruling on a motion for summary judgment, the trial court must consider the substantive burden of proof at trial. *Hurt v. Freeland*, 1999 ND 12, ¶ 8, 589 N.W.2d 551. Summary judgment is not properly granted merely because the trial court believes the movant will prevail if the action is tried on the merits. *Federal Land Bank v. Thomas*, 386 N.W.2d 29, 30–31 (N.D.1986); 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc.: Civil 3d* § 2728 pp. 518–23 (1998). A party seeking summary judgment has the burden of clearly demonstrating there is no genuine issue of material fact. *Hurt* at ¶ 8. A party resisting a motion for summary judgment may not simply rely upon the pleadings or upon unsupported, conclusory allegations, but must present competent admissible evidence by affidavit or other comparable means which raises an issue of material fact, and must, if appropriate, draw the

---

1. Curtis Boudreau and the Estate of Scott Alan Miller settled before trial.

court's attention to relevant evidence in the record raising an issue of material fact. *Id.* Factual assertions in a brief are insufficient to raise an issue of material fact. *L.C. v. R.P.,* 1997 ND 96, ¶ 6, 563 N.W.2d 799; *Northwestern Equip., Inc. v. Badinger,* 403 N.W.2d 8, 10 (N.D.1987). All favorable inferences must be drawn in favor of the party opposing a motion for summary judgment, and we assume the truth of the assertions made by the party opposing the motion. *Fleck v. ANG Coal Gasification Co.,* 522 N.W.2d 445, 448 (N.D.1994). Issues of fact may become issues of law for the court, if reasonable persons could reach only one conclusion from the facts. *Spring Creek Ranch, LLC v. Svenberg,* 1999 ND 113, ¶ 14, 595 N.W.2d 323. Questions of law are fully reviewable. *Miller,* 600 N.W.2d 881, 1999 ND 190, at ¶ 5. In litigation about highway conditions, questions about the construction of statutes or the Manual on Uniform Traffic Control Devices (MUTCD) are questions of law for the court. *Patch v. Sebelius,* 349 N.W.2d 637, 640 (N.D.1984).

## II

[¶ 7] Our legislature has recognized that the operation of state highways, "county roads, city streets, and other public thoroughfares" is of "vital public interest" and has said "it is intended that the state of North Dakota shall have an integrated system of all roads and streets to provide safe and efficient highway transportation throughout the state." N.D.C.C. § 24–01–01. This court's decisions have recognized a duty on the part of political subdivisions to maintain reasonably safe roads and streets. Thus, we have held a county has a duty to provide a safe roadway. *Slaubaugh v. Slaubaugh,* 466 N.W.2d 573, 578 (N.D.1991). We have recognized a duty to exercise reasonable care under negligence principles:

> A municipality, however, has a duty under negligence principles to exercise reasonable care to keep its streets reasonably safe for use by the public and to

guard against unreasonably dangerous conditions which can be foreseen in the exercise of reasonable prudence and care. *See DeLair* [*v. County of La-Moure,* 326 N.W.2d 55 (N.D.1982)] at 62; *Belt* [*v. City of Grand Forks,* 68 N.W.2d 114 (N.D.1955)] at 119–120; *Dahl v. Nelson,* 79 N.D. 400, 56 N.W.2d 757, 761 (N.D.1953); *Maloney v. City of Grand Forks,* 73 N.D. 445, 15 N.W.2d 769, 773 (1944); *Braatz v. City of Fargo,* 19 N.D. 538, 125 N.W. 1042, 1043 (1910); *Ludlow v. City of Fargo,* 3 N.D. 485, 57 N.W. 506, 507–508 (1893); *Larson v. City of Grand Forks,* 3 Dak. 307, 19 N.W. 414, 416 (1884). *See* 19 McQuillin, Municipal Corporations § 54.11 (3rd Rev. Ed.1994).

*Diegel v. West Fargo,* 546 N.W.2d 367, 370 (N.D.1996). *See also Dahl v. Nelson,* 79 N.D. 400, 407, 56 N.W.2d 757, 761 (1953) ("A city is only required to exercise reasonable care to discover and remedy defects in its streets."); *Hanson v. Berry,* 54 N.D. 487, 494–95, 209 N.W. 1002, 1005 (1926) ("The rule that subjects a municipality to liability for the failure to maintain its streets in a reasonably safe condition . . . is predicated upon a duty with respect to the physical condition of the streets."); *Keller v. United States Fidelity & Guar. Co.,* 54 N.D. 449, 454, 209 N.W. 990, 992 (1926) ("The city, of course, was under the duty to keep its streets reasonably safe."); *Anderson v. Jamestown,* 50 N.D. 531, 536, 196 N.W. 753, 754 (1923) ("There is a duty incumbent upon the city to exercise reasonable care to make and maintain its streets and walks reasonably safe for the purposes to which they are respectively devoted, and for the use of persons traveling thereon in the usual modes, by day or by night, and who are themselves in the exercise of reasonable care."); *Moeller v. Rugby,* 30 N.D. 438, 449, 153 N.W. 290, 292 (1915), *quoting* Annotation, *Contributory Negligence as Affecting Liability of Municipal Corporations for Defects and Obstructions in Streets,* 21 L.R.A.(N.S.) 614, 615 (1909) ("[A] city owes its citizens the duty to keep its highways reasonably

safe for persons to pass over."). "[T]he resolution of a municipality's duty involves whether the condition of the street is unreasonably dangerous for a driver exercising ordinary care." *Diegel*, 546 N.W.2d at 372.

[¶ 8] To help assure safe and efficient highway transportation, N.D.C.C. § 39–13–06 requires the director of the department of transportation to "adopt a manual and specifications for a uniform system of traffic-control devices," which "must correlate with and so far as possible conform to the system set forth in the most recent edition of the manual promulgated as a national standard by the federal highway administrator." Section 39–13–07, N.D.C.C., authorizes authorities to place such traffic-control devices "as are deemed necessary," and provides "[n]o traffic-control devices ... may be used on any street or highway which do not conform to the ... manual and specifications for a uniform system of traffic-control devices."

### III

[¶ 9] Boudreaus contend the trial court "Erred in Finding that 'the Crossroad Sign Didn't Have Anything to do with Causing the Accident,'" and contend there is a question of fact as to "Whether the County's Conduct Created 'A Pitfall, Trap, or Snare for a Prudent Driver.'"

[¶ 10] Boudreaus' own expert, Judson Matthias, said in his deposition: "I don't think the crossroad sign had anything to do with this accident, and I think it's irrelevant." When he was asked what blame he placed on the drivers, Matthias said:

I think the drivers are liable. Mr. Erickson, the eastbound driver, either didn't see or failed to yield to a vehicle coming from his right. Rules of the road. Apparently the northbound driver made no attempt to do anything either.... Apparently neither one of them took any evasive action, which indicates they could not or did not see each other in enough time to do anything.

We conclude the trial court did not err in finding as a matter of law the crossroad sign did not cause the accident.

[¶ 11] Boudreaus argue:

Again, the District Court construed the evidence too narrowly and dwelled on the crossroad sign for its finding that "the crossroad sign did not create a pitfall, trap, or snare for a prudent driver." Memorandum Opinion, December 29, 1998, App. 180. Other factors in the equation needed to be considered in order to make such a finding. One of these factors, the limited sight distance at the intersection, has previously been discussed in this brief in section I.G.-SIGHT DISTANCE AT THE INTERSECTION. The other factors to be considered were that the County had designated the east/west road as a through road and had eliminated any signing on that road to convey that fact to drivers. In addition, the County had realized that failure to slow down traffic on the north/south road and make that traffic yield would create a hazardous condition at the intersection where this accident occurred. Unfortunately, the County placed the "wrong sign on the wrong road for the wrong purpose" and failed to accomplish its objectives.

Boudreaus also assert in their brief: "The indication of being on a through road is the *absence* of signs." In arguing the trial court erred in finding the crossroad sign had nothing to do with causing the accident, Boudreaus assert: "The thrust of the plaintiffs' evidence against the County was that Mr. Erickson claimed he had been lulled into assuming that the east/west road was a through road because of the absence of signs."

[¶ 12] Much of Boudreaus' attempt to place responsibility upon Stark County is premised on the absence of signs on the east/west road, which, they assert, indicated the road was a through highway. By statute, a highway is not a through highway unless it has been designated as such and traffic from intersecting highways is

required to yield right of way in obedience to stop or yield signs. N.D.C.C. §§ 39–01–01(79), 39–07–03. Thus, it is the presence of stop or yield signs on intersecting highways that indicate a highway is a through highway.

[¶ 13] In light of the evidence presented to the trial court—a videotape, pictures, and deposition testimony about signing, visibility, and road conditions, we conclude there was no genuine issue as to whether Stark County's conduct created a pitfall, trap, or snare for a prudent driver at the accident intersection. As in *Diegel*, 546 N.W.2d at 373, "[t]he condition of the [intersection] at the time of this accident leads to one conclusion about which reasonable persons could not disagree—it was not an unreasonably dangerous or hazardous condition for a driver exercising ordinary care."

## IV

[¶ 14] Boudreaus contend the trial court "Erred by Finding that 'The Placement of Yield Signs was Discretionary.'"

[¶ 15] There were no signs on the east/west road at the intersection. There were crossroad signs, but no stop or yield signs on the north/south road at the intersection. In his deposition, Roger Leiss, Stark County's "sign man" since 1989, testified he was not aware of any countywide engineering study of signs other than one in the 1960s or 1970s. Leiss said he placed "intersection" signs in 1989 on each side of the intersection on the north/south road "[a]s a courtesy deal, I guess"; it was his idea and he did not get any direction from anybody else. Leiss further testified:

Q. What made you go out and put up signs at this intersection in 1989?

A. Basically, we just kind of redone this stretch of road here a little bit and we regraveled it and I thought they were going to be traveling pretty fast on it, I'll put up a couple signs.

Q. You're talking about the north/south road now?

A. Right.

. . . .

Q. What did you intend to tell the drivers on the north/south road by putting up these kind of signs?

A. Beware.

Q. That there was an intersection?

A. Intersection coming.

Q. Okay. And was it because the intersection was hard to see?

A. No.

Q. Well, if the intersection wasn't hard to see, in other words, if you didn't have any trouble seeing that there was an intersection coming up, why would you put an advance intersection sign there?

A. Slow them down a little bit there going north and south.

. . . .

A. I drive them, yeah. Well, what I was told when I started that signing, to keep the east/west open going to 22 in that particular area, anyway.

. . . .

Q. And by "open," he meant don't put any stop signs or yield signs there?

A. Right.

Q. That was supposed to be the through route?

A. Right.

. . . .

Q. So if I asked you, for example, who had the right of way on the roadway, you would tell me it would be the traffic on the east/west road, right?

A. That's right.

. . . .

Q. Oh, okay. But if you wanted the traffic to yield, if you wanted the traffic on the north/south road to yield to the traffic on the east/west road, why didn't you just use a yield sign on the north/south road?

A. I just didn't think it was necessary.

[¶ 16] Leiss's deposition testimony reflects a misunderstanding of MUTCD and statutory requirements about road signing, assigning right of way, and through highways. MUTCD § 2B–7 provides "[t]he YIELD sign assigns right-of-way to traffic on certain approaches to an intersection." MUTCD § 2B–8 provides:

The YIELD sign may be warranted:

1. At the entrance to an intersection where it is necessary to assign right-of-way and where the safe approach speed on the entrance exceeds 10 miles per hour.

. . . .

5. At any intersection where a special problem exists and where an engineering study indicates the problem to be susceptible to correction by use of the YIELD sign.

MUTCD § 2C–11 provides: "The Cross Road sign is intended for use on a through highway to indicate the presence of an obscured crossroad intersection."

[¶ 17] Section 39–07–03, N.D.C.C., allows authorities to designate through highways, and erect stop signs or yield signs at their entrances. Section 39–01–01(79), N.D.C.C., defines a "through highway":

"Through highway" means every highway or portion thereof on which vehicular traffic is given preferential right of way, and at the entrances to which vehicular traffic from intersecting highways is required by law to yield right of way to vehicles on such through highway and in obedience to either a stop sign or yield sign, when such signs are erected by law.

Section 39–10–22, N.D.C.C., provides the general right-of-way rule:

1. When two vehicles approach or enter an intersection not controlled by an official traffic-control device from different highways at approximately the same time, the driver of the vehicle on the left shall yield the right of way to the vehicle on the right. . . .

2. The right-of-way rule declared in this section is modified at through highways and otherwise as stated in this chapter.

Section 39–10–24(1), N.D.C.C., provides: "Preferential right of way may be indicated by stop signs or yield signs as authorized in section 39–07–03."

[¶ 18] As David Johnson testified in his deposition, Leiss violated the MUTCD by putting up a sign without an engineering study, the crossroad sign Leiss put up was inappropriate for slowing traffic on the north/south road, and it was inappropriate for making traffic on the north/south road yield to traffic on the east/west road. As Boudreaus' expert Judson Matthias said in his deposition, the crossroad sign was the "[w]rong sign in the wrong place for the wrong road." Further, as Matthias said:

A. The rules of the road would have been in effect since this was an uncontrolled intersection.

Q. In other words, the rule of the road that says you yield to vehicles on your right would have been in effect, is what you're saying?

A. Sure.

Matthias testified in his deposition that "a yield sign would have been proper at this point for the northbound traffic," "whether or not the county decides to put up a yield sign at the traffic accident scene is something that is discretionary," and "whether it's necessary to assign right-of-way is a decision which is discretionary."

■ [¶ 19] Under MUTCD § 2B–8 yield signs "may" have been warranted at the intersection and Stark County could have installed them if "deemed necessary," N.D.C.C. § 39–13–07, but yield signs were not required. The 1988 edition of the MUTCD provides in § 1A–4:

The decision to use a particular device at a particular location should be made on the basis of an engineering study of the location. Thus, while this Manual provides standards for design and application of traffic control devices, the

Manual is not a substitute for engineering judgment. It is the intent that the provisions of this Manual be standards for traffic control devices installation, but not a legal requirement for installation.

MUTCD § 1A–5 defines the words "shall," "should," and "may," as they are used in describing conditions concerning the use of traffic control devices:

1. SHALL-a *mandatory* condition. Where certain requirements in the design or application of the device are described with the "shall" stipulation, it is mandatory when an installation is made that these requirements be met.

2. SHOULD-an *advisory* condition. Where the word "should" is used, it is considered to be advisable usage, recommended but not mandatory.

3. MAY-a *permissive* condition. No requirement for design or application is intended.

Where the MUTCD makes a recommendation by using the word "may," locating signs inconsistently with the MUTCD's recommendation does not in itself result in a breach of a county's duty to users of an intersection. *Selvig v. Caryl*, 97 Wash. App. 220, 983 P.2d 1141, 1143 (1999).

[¶ 20] As Boudreaus' counsel recognized at the hearing on the motion for summary judgment, the MUTCD "never dictates to anybody, whether it be city, county, or otherwise, what sign you have to put up at a given location. In other words, you won't find anything in the manual that says a yield sign is required at all at a rural intersection." The MUTCD similarly did not require the county to erect stop signs at this intersection. The county was not required to make the east/west road a through road nor did it do so. Under the circumstances presented, we conclude the district court did not err in concluding installation of yield signs was discretionary.[2]

2. Section 32–12.1–03(3), N.D.C.C., provides a political subdivision is not liable for any claim based on the act of an employee exercising

V

[¶ 21] We conclude the trial court did not err in granting summary judgments dismissing Stark County. The orders and judgments are affirmed.

[¶ 22] GERALD W. VANDE WALLE, C.J., and WILLIAM A. NEUMANN, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ., concur.

due care in the exercise or performance of, or failure to exercise or perform, a discretionary function.